UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

---------------------------------------------------------------------X

| | | |
|---|---|---|
| MICHAEL STINSON, | : | |
| Plaintiff, | : | |
| V. | : | |
| CITY OF BRIDGEPORT; MAYOR WILLIAM FINCH, Individually and as Mayor of the City of Bridgeport; CHIEF JOSEPH L. GAUDETT, JR., Individually and as Chief of the Bridgeport Police Department; LT. REBECCA GARCIA, Individually and as Lieutenant of the Bridgeport Police Department; SGT. MANUEL COTTO, Individually and as Sergeant of the Bridgeport Police Department; SGT. JOSEPH ADILETTA, Individually and as Sergeant of the Bridgeport Police Department; SGT. TJUANA BRADLEY WEBB, Individually and as Sergeant of the Bridgeport Police Department; SGT. RONALD MERCADO, Individually and as Sergeant of the Bridgeport Police Department; P.O. JOSEPH LAWLOR, Individually and as an Officer of the Bridgeport Police Department; and P.O. ELSON MORALES, Individually and as an Officer of the Bridgeport Police Department, | : | 3:13-cv-1563(JBA)<br><br>JURY TRIAL DEMANDED |
| Defendants. | : | |

-----------------------------------------------------------------X

## AMENDED COMPLAINT

The plaintiff, by and through his attorneys, Robert Berke, Esq. and Gary A. Mastronardi, Esq., complains and alleges as follows:

## I. INTRODUCTION

1. This is an action to redress the deprivation under color of state law of certain rights secured to the plaintiff under the Fourth and Fourteenth Amendments of the United States Constitution as well as under principles of the common law of the State of Connecticut.

2. The injuries alleged herein to have been suffered by the plaintiff were all the direct and proximate result of: (a) certain unlawful, outrageous and physically abusive police conduct engaged in by three rogue officers of the Bridgeport Police Department while effecting the arrest of the plaintiff on or about May 5, 2012; and (b) deliberate indifference on the part of various supervisory officials, at various levels within the supervisory hierarchy of the Bridgeport Police Department, all of whom, for more than a year prior to May 5, 2012, had many opportunities to take affirmative steps, and to implement remedial measures, which would likely have prevented the three aforementioned officers from engaging in the type of unlawful conduct which caused plaintiff's injuries, but failed to do so, when the said supervisory officials knew, or should have known to a moral certainty, that failure on their part to act in a timely and decisive manner to protect the public from these three rogue policemen, was likely to result in <u>more</u> physical injuries to <u>more</u> citizens, including the plaintiff, than had already been reported to the defendants in numerous prior excessive force complaints brought against these same three police officers by members of the community

## II. JURISDICTION AND VENUE

3. The jurisdiction of this Court is invoked under the provisions of 28 U.S.C. §§1331, 1343(a)(3) and 1367(a), as well as 42 U.S.C. §1983.

4. Venue lies in this District under the provisions of 28 U.S.C. §1391.

## III. THE PARTIES

5. The plaintiff, MICHAEL STINSON, is a citizen of the United States and resident of Bridgeport, Connecticut.

6. The defendant, CITY OF BRIDGEPORT, is a municipal corporation organized and existing under the laws of the State of Connecticut. As such, defendant Bridgeport acts under color of state law.

7. The defendant, WILLIAM FINCH, is the Mayor and Chief Executive Officer of the City of Bridgeport, as well as the ex officio Chairman of the Board of Police Commissioners of the City of Bridgeport. Said Board of Police Commissioners is charged under the Bridgeport Charter with the responsibility of general management and control of the affairs of the Bridgeport Police Department, including the department's Office of Internal Affairs. As such, defendant Finch acts under color of state law.

8. The defendant, JOSEPH L. GAUDETT, JR., is the Chief of the Bridgeport Police Department. Under Bridgeport's Charter, subject to the control of the mayor and board of police commissioners, defendant Gaudett is charged with the duty to control and manage the subordinate officers and members of the Bridgeport Police

Department, including members of the department's Office of Internal Affairs. As such, defendant Gaudett acts under color of state law.

9. The defendants, MANUEL COTTO, JOSEPH ADILETTA and TJUANA BRADLEY-WEBB, are uniform members of the Bridgeport Police Department. At all times hereinafter mentioned, defendants Cotto, Adiletta and Bradley-Webb all occupied the rank of Sergeant and were assigned to the Office of Internal Affairs of the Bridgeport Police Department. As internal affairs officers, defendants Cotto, Adiletta and Bradley-Webb were responsible for investigating misconduct complaints made by citizens against members of the Bridgeport Police Department. As such, defendants Cotto, Adiletta and Bradley-Webb acted under color of state law.

10. The defendant, REBECCA GARCIA, is a uniform member of the Bridgeport Police Department. At all times hereinafter mentioned, defendant Garcia occupied the rank of Lieutenant, and was assigned to the Office of Internal Affairs of the Bridgeport Police Department. As an internal affairs Lieutenant, defendant Garcia was responsible, inter alia, to supervise Sergeants Cotto, Adiletta and Bradley-Webb in their investigations of citizens' complaints of misconduct against members of the Bridgeport Police Department. As such, defendant Garcia acted under color of state law.

11. The defendants, LAWLOR, MERCADO AND MORALES, are all uniform members of the Bridgeport Police Department. At all times hereinafter mentioned, defendants Lawlor and Morales were patrol officers and defendant Mercado was a

Sergeant. As such, defendants Lawlor, Mercado and Morales acted under color of state law.

## IV. BACKGROUND

12. The Office of Internal Affairs is an investigative arm of the Bridgeport Police Department charged with the responsibility of accepting and investigating citizens' complaints of police misconduct against rank and file members of the department.

### A. Prior Acts of Misconduct by Mercado, Lawlor and Morales

#### (1) William Feliciano

13. On or about December 3, 2010, an individual named William Feliciano was arrested by defendants Mercado and Lawlor on Gilmore Street in Bridgeport, after a brief car chase, and later charged by police with some motor vehicle violations.

14. During the course of effecting Feliciano's arrest, as Feliciano lay outstretched on the ground, on his stomach, handcuffed from behind, totally incapacitated, and unable to engage in any conduct constituting resistance, Mercado, Lawlor and two other Bridgeport police officers who had arrived to assist repeatedly kicked Feliciano in the face, head, mouth and other parts of his body.

15. As a result of the assaultive actions of Mercado, Lawlor, and others, Feliciano suffered bilateral mandibular fractures, was required to undergo two surgeries, and incurred medical bills in excess of $125,000.00.

16. On or about February 8, 2011, two months after the event, Feliciano served notice on defendant Bridgeport of his intention to bring excessive force claims under the Civil Rights Act against, inter alia, defendants Mercado and Lawlor.

**(2) Efrain Perez**

17. On or about December 30, 2011, an individual named Efrain Perez was arrested by defendants Lawlor and Morales in the presence of defendant Mercado. During the course of effecting said arrest, after handcuffing Perez, Mercado watched as defendants Lawlor and Morales rammed Perez's head into a wall causing him to briefly lose consciousness, rubbed his face into the ice and snow on the street, repeatedly beat him in the head, face and neck, and repeatedly accused him of being a "Latin King."

18. On or about December 31, 2011, Efrain Perez filed a citizen's complaint against defendants Lawlor and Morales with the Office of Internal Affairs claiming that they had used excessive force in arresting him. The complaint was received by defendant Cotto on that date.

19. On or about February 11, 2011, defendant Cotto recommended that the "Perez" matter be closed based upon a determination that the allegations in his complaint were "unfounded." Even though the police department had received notice, just three days earlier, of serious claims of assault that had been asserted by William Feliciano against, inter alia, defendants Lawlor and Mercado, defendant Cotto did not consider the prior claims of excessive force made by Feliciano against Mercado and

Lawlor as relevant in assessing the strength of Perez's claim, or the credibility of Lawlor's explanation, did not actively investigate Perez's excessive force claims against Lawlor and Morales, and defendants Garcia, Gaudett and Finch not only failed to require that Cotto investigate, they tacitly ratified Cotto's subsequent recommendation that the "Perez" case not be investigated and, instead, be "closed as unfounded."

**(3) Aaron Bracey**

20. On or about January 4, 2011, only four days after receiving the citizen's complaint of Efrain Perez against defendants Lawlor and Morales, defendant Cotto received another complaint against Lawlor and Morales, this one, from an individual named Aaron Bracey.

21. Bracey's complaint indicated that, on January 3, 2011, at about 6:00 p.m., he was leaning on a parked car in the area of 1482 Reservoir Avenue in Bridgeport, waiting to be picked up by his ride to work, when he was suddenly approached by defendants Lawlor and Morales.

22. According to Bracey, as the officers approached, he was ordered by Morales to remove his hands from his pockets, and Bracey immediately complied. Then, defendant Lawlor grabbed Bracey's arm, spun him around, forcefully pushing him down and pinning his chest on the hood of the car, and as Morales began to ask him questions, Lawlor (1) kept Bracey pinned on the car, while he (2) kicked Bracey's feet apart and (3) searched through Bracey's pockets.

23. During defendant Morales's questioning of Bracey, Bracey was "threatened with arrest for being facetious" and, thereupon, Morales took Bracey's right hand and arm and twisted them behind his back "in a fashion where [his arm] could have easily broken if [Bracey] moved." When Bracey told Morales that the way the police were treating him was unnecessary because he was cooperating, defendant Morales told him "you're not cooperating, you're being a smart ass."

24. Thereupon, Bracey was placed in handcuffs, for no reason, and then placed into the defendants' police cruiser. After a while, Bracey was removed from the cruiser, uncuffed, and handed a one hundred dollar ticket for loitering. In his complaint, Bracey also reported that when Morales twisted his arm behind his back, he had suffered a shoulder injury for which he intended to seek medical attention.

25. On or about February 24, 2011, defendant Cotto recommended to defendants Garcia, Gaudett and Finch that the Bracey matter be closed based upon a determination by Cotto that the allegations in Bracey's complaint were "unfounded." On or about February 28, 2011, Cotto's recommendation was adopted by defendants Garcia, Gaudett and Finch.

26. Even though, by the date of defendant Cotto's recommendation regarding the "Bracey" complaint, and the decision of defendants Garcia, Gaudett and Finch to adopt that recommendation, the Office of Internal Affairs was already in possession of two prior excessive force complaints against Lawlor, one of which involved Morales as well, and one of which involved Mercado as well, defendants Cotto, Garcia, Gaudett

and Finch did not consider the two prior excessive force complaints as relevant in assessing the strength of Bracey's claims, and they conducted no investigation whatsoever of Bracey's citizen complaint.

**(4) Angel Santiago**

27. On or about April 20, 2011, approximately four months after receiving the excessive force complaints of Efrain Perez and Aaron Bracey against defendants Lawlor and Morales, and only two months since receiving notice of William Feliciano's excessive force complaint specifically naming defendants Lawlor and Mercado as two of four officers who had viciously assaulted him during a motor vehicle arrest, defendant Sergeant Joseph Adiletta of the Office of Internal Affairs received a citizen's complaint from an individual named Angel Santiago.

28. In his complaint, Santiago claimed that, on April 19, 2011, while being arrested by defendant Lawlor and others, he suffered serious injuries as a result of excessive force employed by Lawlor in carrying out his arrest. Santiago, like his predecessors, Feliciano and Perez, claimed that after being handcuffed from behind, and placed on the ground on his stomach, Santiago was kicked repeatedly by Lawlor in the head, face and mouth. At the time he made his complaint, Santiago also provided Adiletta with photos graphically depicting the horrendous mouth and face injuries that had been inflicted by Lawlor.

29. Even though the Internal Affairs Office was now in possession of three prior complaints against Lawlor, two of which were based upon claims of excessive and

gratuitous force inflicted in a manner remarkably similar in their level of brutality to what Santiago now described, Adiletta did not consider the prior excessive force claims of Feliciano, Perez and Bracey against Lawlor as relevant in assessing the strength of Santiago's claim, or the credibility of Lawlor's explanation, did not refer the matter for criminal investigation, did not confer with the state's attorney's office, and conducted no meaningful investigation whatsoever on his own of Santiago's citizen complaint.

30. On or about May 14, 2011, Santiago's complaint was dismissed by the Office of Internal Affairs as a result of having been "withdrawn" by Santiago. Said dismissal occurred with the knowledge and approval of defendants Adiletta, Garcia, Gaudett and Finch, and despite the fact that, at the time Santiago withdrew his complaint, he nonetheless continued to insist to Adiletta that he had been brutally beaten by Lawlor, that he had suffered the horrendous injuries depicted in his photos, and that Lawlor had beaten him <u>after</u> Santiago had "surrendered" to the police, <u>after</u> he was put in handcuffs, and <u>after</u> Lawlor had become fully aware of the fact that Santiago was unable to resist an arrest. On information and belief, defendants Garcia, Gaudett and Finch were all aware of the facts underlying Santiago's complaint, as well as the factual allegations set forth in the three other very serious prior complaints, those of Feliciano, Perez and Bracey, and, nonetheless, all three ranking Bridgeport officials ignored the prior complaints and ratified a decision by Adiletta to simply dismiss Santiago's complaint without conducting any investigation, and without taking any steps to ensure that Lawlor not be in a position to brutalize any more citizens in the future.

**(5) Ramon Sierra**

31. On or about May 23, 2011, an individual named Ramon Sierra was stopped and detained by a Bridgeport police officer named Arroyo as Sierra walked along Boston Avenue in Bridgeport, minding his own business, on his way to a store. Shortly after stopping Sierra, Arroyo was joined at the scene by defendants Lawlor and Morales, who had arrived purportedly to "lend assistance" to Arroyo. While Lawlor and Morales searched Sierra, who is permanently handicapped due to paralysis on one side of his body, Sierra merely inquired of Morales as to why it was that he was being detained and searched by the police for what appeared to Sierra, at the time, to be no reason. Thereupon, Morales and Lawlor slammed this unresisting, partially-paralyzed individual to the ground, drove his head into the side of the police cruiser, and caused Sierra to suffer injuries to his head and body. The head injury subsequently required suturing at a nearby hospital.

32. In or about November of 2011, Sierra made a citizens' complaint charging excessive force against Lawlor and Morales as a result of the May 23, 2011 incident. The complaint was subsequently assigned to defendant Bradley-Webb for a so-called "investigation."

33. Even though, by the year 2012, when Bradley-Webb's investigation of Sierra's complaint finally concluded, the Office of Internal Affairs had received no less than eight prior citizens' complaints against Lawlor, and six against Morales -- all involving the alleged use of excessive and gratuitous force, and all but one alleging

injuries that had been inflicted under circumstances remarkably similar to those described by Sierra -- to put Bridgeport's highest ranking officials on notice of Lawlor's and Morales's dangerous propensity for violence and brutality when making arrests, defendant Bradley-Webb, on November 12, 2012, nonetheless issued a report "exonerating" defendants Morales and Lawlor in the assault of Ramon Sierra. In reaching her findings exonerating Lawlor and Morales, Bradley-Webb ignored the significance of numerous prior complaints in assessing both the credibility of Sierra's claims and the credibility of the explanations provided by the officers in response to Sierra's complaint against them.

34. Defendant Bradley-Webb's decision was subsequently adopted and ratified in full by defendants Garcia, Gaudett and Finch. On information and belief, in reaching their decisions to adopt Bradley-Webb's recommendations, defendants Garcia, Gaudett and Finch attached no significance whatsoever to the numerous prior citizen's complaints of excessive force against Lawlor and Morales that preceded and followed Sierra's; indeed, all of those complaints were not even considered.

**(6) Orlando Lopez-Soto**

35. On or about May 20, 2011, only three days prior to the Sierra episode described hereinabove, defendants Lawlor and Morales arrested an individual named Orlando Lopez-Soto in the Beardsley Park area of Bridgeport after a short chase on foot.

36. During Lopez-Soto's arrest, Lawlor, Morales and an officer named Clive Higgins, who had arrived to "lend assistance" to Lawlor and Morales, repeatedly kicked Lopez-Soto in the head, face and body while Lopez-Soto, having just been "tazed" by Morales a few seconds earlier, lay in a prone position on the ground, on his stomach, face down, in a totally incapacitated state, and totally incapable of resisting his arrest.

37. After this occurrence, however, Lopez-Soto did <u>not</u> make a citizen's complaint and, therefore, as of May 20, 2011, neither the internal affairs office nor any of the individuals responsible for supervising police officers were aware of the misconduct of Lawlor and Morales in the Lopez-Soto arrest.

**(7) <u>Courtney Swabey</u>**

38. On or about August 16, 2011, an individual named Courtney Swabey was arrested by defendants Lawlor and Morales after he had criticized them publicly for the excessive and unreasonable methods he had just witnessed them using, minutes earlier, in effecting the arrest of a female friend of Swabey's. After placing Swabey in handcuffs from behind, defendants Lawlor and Morales escorted Swabey toward their police cruiser, and then, suddenly, before reaching their cruiser, threw him onto the ground.

39. As Swabey lay on the ground, Lawlor initially jeered him, asking why it was that he (Swabey) seemed to be unable to stand up and walk. When Swabey answered "because you keep throwing me on the ground," Lawlor became enraged and he and Morales began to kick Swabey, who was still lying handcuffed on the ground,

repeatedly in the head and body causing injuries to Swabey's throat, upper back, arms, stomach and jaw, and requiring that Swabey be taken to a hospital for medical treatment.

40. On or about August 20, 2011, Swabey filed a citizen's complaint against Lawlor and Morales. The complaint was accepted by Bridgeport Police Sergeant Matthew Cosgrove, who promptly forwarded Swabey's complaint to the Office of Internal Affairs.

41. Swabey's complaint was strikingly similar in all respects to the many prior complaints that had been filed by other brutality victims of Lawlor and Morales, dating as far back as January of 2011. Yet, the Office of Internal Affairs has no record of any kind indicating that any investigation of Swabey's complaint was ever conducted. On information and belief, no record exists because no investigation of this complaint was ever done by any member of the Office of Internal Affairs.

**(8) <u>William Bravo</u>**

42. On or about November 3, 2011, an individual named William Bravo was arrested by defendants Lawlor, Morales, Mercado and others after a brief chase on foot, and subsequently charged with the relatively minor offense of possessing a small quantity of marijuana. During the course of this minor marijuana arrest, however, Bravo was repeatedly struck by Lawlor in the head with his service gun, kicked by Lawlor and Morales in the head, body and face, punched by Lawlor in the eyes repeatedly, and

rammed, head-first, by Lawlor, numerous times, into the wall of a building, all while in handcuffs and unable to offer any meaningful resistance.

43. On or about November 16, 2011, Bravo filed a citizens' complaint against Lawlor with the Office of Internal Affairs. On or about November 21, 2011, Bravo's complaint was received and acknowledged by defendant Cotto.

44. On or about January 19, 2012, despite all of the numerous complaints made against Lawlor and Morales in the past, Cotto did not consider the numerous prior excessive force claims against Lawlor and Morales as relevant in assessing both the strength of Bravo's complaint and the credibility of any explanation offered by Lawlor and Morales, he did not refer Bravo's charges for criminal investigation, he did no meaningful investigation himself into Bravo's claims and, on January 19, 2012, despite all of the foregoing, he recommended to defendants Garcia, Gaudett and Finch that Bravo's complaint to the Internal Affairs Office be "closed as unfounded."

45. Thereafter, Cotto's recommendation was duly adopted by defendants Garcia, Gaudett and Finch, who, on information and belief, also did not consider the numerous prior excessive force claims against Lawlor and Morales as relevant in assessing both the strength of Bravo's complaint, and the credibility of any explanation offered by Lawlor and Morales.

**B. <u>Relevant Claims of Plaintiff Stinson</u>**

46. On or about May 5, 2012, Michael Stinson was driving his car in the vicinity of the P.T. Barnum Housing Complex in Bridgeport when defendant Mercado

made a motor vehicle stop of Stinson, purportedly because Stinson's vehicle had tinted windows that were "extremely dark."

47. In effecting the foregoing motor vehicle stop on a car with "tinted windows," Mercado pulled his police cruiser behind Stinson's car, exited his vehicle, drew his service weapon, and initially ordered Stinson, who had already begun to exit his vehicle as well, to get back into that vehicle and await further instructions.

48. Shortly thereafter, Mercado (a) ordered Stinson to exit his vehicle; (b) handcuffed Stinson from behind without an arrest warrant or any legal justification for doing so; (c) searched Stinson's person without a search warrant or any legal justification for doing so; (d) asked Stinson if he had any drugs or weapons on him, without first providing valid Miranda warnings; and (e) asked Stinson for consent to search his vehicle.

49. Stinson answered "No" to every question addressed to him by defendant Mercado.

50. Shortly thereafter, Mercado was joined at the scene of the motor vehicle stop by two more policemen, Officers Lawlor and Morales.

51. Thereafter, Morales began to address more questions to Stinson about the vehicle Stinson was driving, and when Stinson decided that he no longer wished to answer police questions, defendant Mercado, for no reason, suddenly grabbed the back of plaintiff's neck and began yelling "what's in your mouth?"

52. Stinson responded to Mercado's question clearly stating that there was nothing in his mouth, and that Mercado knew full well that there was nothing in Stinson's mouth because he (Stinson) had been conversing with Mercado just a few moments earlier when Mercado first handcuffed him.

53. Stinson's response to Mercado's question caused Mercado to become angry. Mercado said to Stinson, in a loud voice, "who do you think you are talking to," and then slammed Stinson to the ground. While lying on the ground, handcuffed from behind, and unable to resist the police, defendant Mercado grabbed Stinson's neck and began to choke him, repeatedly ordering Stinson to "spit out" from his mouth something that Mercado knew full well was not there, and Lawlor and Morales began to kick Stinson in the head, stomach, groin and body.

54. Then, when Stinson tried to deflect repeated kicks by Lawlor and Morales to his stomach and groin, as well as Mercado's two-handed hold on his neck, by trying to roll onto his side, Morales reached down, grabbed Stinson's head, and slammed it into the pavement.

55. Also during the course of this outrageous police seizure of Stinson, while Stinson was handcuffed and on the ground, Officer Lawlor sprayed mace in Stinson's mouth.

56. After a while, a group of observers, interested in what was occurring, began to gather nearby in order to watch. The appearance of the group caused the police to stop assaulting Stinson and, thereafter, defendant Mercado lifted Stinson from

the ground and walked him, still handcuffed from behind, to the opened, rear driver's side door of Mercado's police cruiser.

57. As Stinson stood handcuffed inside the rear door area of Mercado's cruiser, waiting to be placed into the back seat, Mercado heard Stinson comment to a nearby group of spectators, in a voice loud enough for everyone in the group to hear, that: "the Bridgeport police is the biggest gang in the world."

58. Stinson's statement to the group of spectators caused laughter among the onlookers, and that laughter caused Mercado to become enraged. Thereupon, Mercado, yelling profanities, grabbed Stinson by the neck from behind, lifted him up off the ground, drove Stinson's body, initially, forward and then violently whipped him backwards, body-slamming Stinson hard onto the pavement and causing Stinson to scream in extreme pain.

59. Mercado, then, lifted Stinson, still screaming in pain, and forced him feet first into the backseat of the cruiser.

60. None of the three police defendants at the scene of Stinson's arrest did anything to intervene to prevent any of the acts of brutality inflicted by any of the others. Indeed, at all times, all acted jointly, thereby assisting each other in assaulting Stinson.

## C. <u>Relevant Subsequent Events</u>

### The Lopez-Soto Video

61. Unbeknownst to defendants Lawlor and Morales, as well as other officers who were at the scene of the May 20, 2011 arrest of Orlando Lopez-Soto, (described <u>supra</u> herein at Part IV, Section A(5) paras. 35-37), a video of that event was made by some anonymous observers capturing on film virtually everything that had occurred at the time Lawlor and Morales arrested Orlando Lopez-Soto.

62. In the Lopez-Soto video, defendants Lawlor and Morales (and an officer named Clive Higgins, who had arrived as a backup a few seconds after Lopez-Soto's apprehension by Lawlor and Morales) are all graphically depicted brutally kicking and stomping on Lopez-Soto, over and over again, in the head, face and body, in the <u>identical</u> manner previously reported by Feliciano, Perez, Santiago, Swabey, Sierra, Bravo and Stinson, while Lopez-Soto, having just been "tazed" by Morales seconds earlier, lay limp in a prone position on the ground, on his stomach, in a totally incapacitated state, and entirely incapable of presenting any resistance at all to the police.

63. The video of the Lopez-Soto incident did not come to light until around January of 2013, when it was published, anonymously, on YouTube under the reference: "Bridgeport, CT. Police Beat Taze 018.mov" (Nosmo King).

64. The public disclosure of the "Lopez-Soto" video on YouTube ignited a powerful public outcry throughout the State of Connecticut, and particularly in the City of

Bridgeport, against the Bridgeport Police Department. This public outcry placed defendants Finch, Gaudett and Garcia into the very uncomfortable position of now having no choice but to take remedial action, at least as against Lawlor, Morales and the third officer depicted in the video, in order, at minimum, to create the façade that the police department's prime decision-makers might actually be interested in protecting the public from dangerous police officers.

65. But for that YouTube video, however, the likelihood is that no meaningful investigation, no meaningful supervision or review, and, to be sure, no disciplinary action of any kind whatsoever, would ever have been taken by defendants Gaudett, Garcia and Finch against Lawlor and Morales, despite the legion of previous misconduct claims brought by citizens against these officers.

66. Indeed, as proof-positive of the foregoing assertion, even to this day, despite prior, serious excessive force complaints, including William Feliciano's notice of claim provided in February of 2011 and plaintiff Stinson's complaint lodged in May of 2012, implicating not only Lawlor and Morales, but Mercado as well, in criminal assaultive conduct, no disciplinary action of any kind has yet to be taken by Bridgeport and its highest ranking law enforcement supervisors against defendant Mercado -- a clear indication that, in the City of Bridgeport, it is impossible for a police officer to suffer discipline as a result of an excessive force complaint lodged against him by a citizen because the citizen's allegations are <u>never</u> accepted as true by ranking department

officials; unless, of course, the police assault of the citizen also happens to be somehow fortuitously captured on film, and then made public.

**COUNT ONE**
**(42 U.S.C. §1983)**

(Municipal Liability--As against defendants Bridgeport, Finch, Gaudett, Garcia, Cotto, Adiletta and Bradley-Webb)

67. Paragraphs 1 through 58 are repeated and realleged as if fully set forth herein.

68. During a narrow, sixteen-month time period, between January 1, 2011 and April 30, 2012, prior to plaintiff Stinson's May 5, 2012 assault by defendants Lawlor, Morales and Mercado, the Office of Internal Affairs had received, either directly or indirectly, and was therefore fully aware of, no less than seven separate excessive force complaints, all of which involved either one, two, or all three of the same police officers -- Lawlor, Morales and Mercado.

69. The claims asserted in all seven of the complaints received by Bridgeport's Office of Internal Affairs involved allegations of brutal and sadistic behavior by these three officers that was not only extremely serious, but also extremely heinous in nature, because the allegations always involved not just claims of "excessive" force against three specific officers, but, far worse, claims of entirely "gratuitous" excessive force; i.e., force that is viciously and sadistically meted out by a police officer, punitively, for no legitimate reason at all, upon a handcuffed arrestee who is not able to resist an arrest. In all but one of the seven complaints, the complainant-arrestees all reported

that they had been severely and viciously beaten by one or more of these officers after surrendering to police, after being handcuffed from behind, and after being totally incapacitated and unable to resist an arrest by the police. And in all of the cases, the assaultive police behavior reported by each of the complainants actually rose to the level of criminal conduct under both state and federal law.

70. Viewed as a whole, therefore, the undeniably criminal nature of the alleged misconduct complained of, the particularly vicious, sadistic and heinous nature of that misconduct, the striking similarities in the factual allegations reported in each of the complainants' complaints, and the alarming frequency with which these complaints were being received by the Internal Affairs Office of the Bridgeport Police Department against the same officers, time and again, clearly and convincingly evidenced a "pattern" of criminally vicious and sadistic misconduct on the part of defendants Lawlor, Morales and Mercado which should have been a "red flag" to reasonably competent internal affairs officials, and those responsible for supervising and overseeing the operations of the internal affairs office, of the strong likelihood that defendants Lawlor, Morales and Mercado were rogue officers who were accustomed to violating the constitutional rights of citizens with impunity, and that, therefore, there was a compelling public need for close scrutiny, careful monitoring, aggressive and thorough investigation, tight supervision and decisive disciplinary action against these three officers.

71. Despite such clear notice, however, rather than acting decisively to protect its citizenry, the City of Bridgeport, through its relevant officials, defendants Finch, Gaudett, Garcia, Cotto, Adiletta and Bradley-Webb, acting under color of state law, tacitly tolerated and acquiesced in a custom (or "course of conduct") amounting to deliberate indifference on their part to the excessive use of force by its police officers by permitting a situation to exist where police officers were consistently not scrutinized, not monitored, not investigated and never disciplined, for the numerous complaints of repeated physical abuse of citizens, all in violation of rights guaranteed to plaintiff under the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983.

72. If the supervisory defendants identified above had not acted with deliberate indifference to the constitutional rights of the plaintiff and the public at large; if they had, instead, properly supervised, monitored, investigated, reviewed, reprimanded and disciplined the conduct of defendants Lawlor, Morales and Mercado, in a timely and effective manner, rather than consistently condoning it, ignoring it, and, indeed, even defending it, there is a substantial likelihood that plaintiff Stinson, who was viciously attacked and injured by Mercado, Lawlor and Morales on May 5, 2012, would not have been attacked by those officers, and would not, therefore, have suffered the injuries that they inflicted upon him.

**COUNT TWO**
**(42 U.S.C. §1983)**

(Municipal Liability; as against defendants Bridgeport, Garcia, Gaudett and Finch)

73. Paragraphs 1 through 71 are repeated and realleged as if fully set forth herein.

74. At all times relevant herein, defendants Adiletta, Bradley-Webb and Cotto acted under the direct supervision of defendants Bridgeport, Garcia, Gaudett and Finch. As such, it was the duty of defendants Bridgeport, Garcia, Gaudett and Finch to ensure that defendants Adiletta, Bradley-Webb and Cotto were adequately trained to carry out their essential duties of taking internal affairs complaints and investigating them.

75. If the numerous complaints of police misconduct against defendants Lawlor, Morales and Mercado had been properly assessed, evaluated and investigated by internal affairs officers in a timely and effective fashion, there is a substantial likelihood that the plaintiff would not have suffered the injuries and constitutional deprivations inflicted upon him by Lawlor, Morales and Mercado on May 5, 2012.

76. The failure to ensure that internal affairs officers were adequately trained in investigating police misconduct complaints before allowing the officers to accept and investigate citizen complaints of police misconduct constituted deliberate indifference to the rights of citizens, including plaintiff, who were unnecessarily exposed to the dangers of abusive conduct on the part of Lawlor, Mercado and Morales, and suffered injuries at

the hands of those officers, in violation of rights guaranteed under the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

77. As a direct and proximate result of Bridgeport's failure to adequately train its internal affairs officers, the plaintiff suffered injuries.

**COUNT THREE**
**(42 U.S.C. §1983)**

(As against defendants Lawlor, Morales and Mercado)

78. Paragraphs 1 through 58 are repeated and realleged as if fully set forth herein.

79. By reason of the foregoing acts, circumstances and events, defendants Lawlor, Mercado and Morales, acting under color of state law, engaged in the use of excessive and reasonable force in effecting the arrest of the plaintiff, Michael Stinson, in violation of rights guaranteed to the plaintiff under the Fourth Amendment of the United States Constitution, and 42 U.S.C. §1983.

80. As a direct and proximate result of the excessive and, indeed, gratuitous acts of force inflicted upon Stinson by the police, Stinson suffered serious and painful injuries to his chest, legs, head and arms, as well as extreme swelling to his face.

81. As a further result, the plaintiff was caused to suffer extreme mental and emotional distress, fear, anguish, torment, embarrassment and degradation.

**COUNT FOUR**
**(Common Law Assault--As against defendants Mercado, Lawlor and Morales, jointly and severally)**

82. Paragraphs 1 through 58 above are repeated and realleged as if fully set forth herein.

83. By reason of the foregoing acts, circumstances and events, the defendants purposefully, and/or with knowledge to a substantial certainty that an apprehension of an imminent harmful and/or offensive physical contact would result, caused plaintiff to suffer an apprehension of an imminent harmful and/or offensive physical contact; and/or the defendants purposefully, and/or with knowledge to a substantial certainty that a harmful and/or offensive physical contact would result, attempted to physically contact plaintiff in a harmful and/or offensive manner and actually caused plaintiff to suffer an apprehension of an imminent harmful and/or offensive physical contact.

84. Paragraphs 72 and 73 are repeated and realleged as if fully set forth herein.

**COUNT FIVE**
**(Common Law Battery--As against defendants Mercado, Lawlor and Morales, jointly and severally)**

85. Paragraphs 1 through 58 are repeated and realleged as if fully set forth herein.

86. By reason of the foregoing acts, circumstances and events, the defendants purposefully, and/or with knowledge to a substantial certainty that a harmful

and/or offensive physical contact would result, physically contacted the plaintiff in a harmful and/or offensive manner; and/or the defendants purposefully, and/or with knowledge to a substantial certainty that an apprehension of an imminent, harmful and/or offensive physical contact would result, attempted to cause the plaintiff to suffer an apprehension of an imminent, harmful and/or offensive physical contact.

87. Paragraphs 72 and 73 are repeated and realleged as if fully set forth herein.

WHEREFORE, the plaintiff claims judgment against the defendants as follows:

**As to Count One:**

As to defendant Bridgeport

1. Compensatory damages in an amount not yet fully ascertained, but not less than $1,000,000.00;

2. Costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and

3. Such other relief as the Court may deem appropriate.

As to defendants Finch, Gaudett and Garcia, jointly and severally

1. Compensatory damages in an amount not yet fully ascertained, but not less than $1,000,000.00;

2. Punitive damages in an amount not less than $1,000,000.00;

3. Costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and

4. Such other relief as the Court may deem appropriate.

As to defendants Cotto, Adiletta and Bradley-Webb, jointly and severally

1. Compensatory damages in an amount not yet fully ascertained, but not less than $1,000,000.00;

2. Punitive damages in an amount not less than $1,000,000.00;

3. Costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and

4. Such other relief as the Court may deem appropriate.

**As to Count Two:**

As to defendant Bridgeport

1. Compensatory damages in an amount not yet fully ascertained, but not less than $1,000,000.00;

2. Costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and

3. Such other relief as the Court may deem appropriate.

As to defendants Finch, Gaudett and Garcia, jointly and severally

1. Compensatory damages in an amount not yet fully ascertained, but not less than $1,000,000.00;

2. Punitive damages in an amount not less than $1,000,000.00;

3. Costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and

4. Such other relief as the Court may deem appropriate.

**As to Count Three**

As to defendants Lawlor, Mercado and Morales, jointly and severally

1. Compensatory damages in an amount not yet fully ascertained, but not less than $1,000,000.00;

2. Punitive damages in an amount not less than $1,000,000.00;

3. Costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and

4. Such other relief as the Court may deem appropriate.

**As to Count Four**

As to defendants Lawlor, Mercado and Morales, jointly and severally

1. Compensatory damages in an amount not less than $1,000,000.00;
2. Punitive damages, including costs and attorneys' fees; and
3. Such other relief as the Court may deem appropriate.

**As to Count Five**

As to defendants Lawlor, Mercado and Morales, jointly and severally

1. Compensatory damages in an amount not less than $1,000,000.00;
2. Punitive damages, including costs and attorneys' fees; and
3. Such other relief as the Court may deem appropriate.

Dated: April 15, 2014
Bridgeport, Connecticut

THE PLAINTIFF,
MICHAEL STINSON

/s/

BY: ______________________________

Gary A. Mastronardi
211 State Street
Bridgeport, Connecticut 06604
Tel: (203) 368-0411
Fax: (203) 368-6875
gamlaw@snet.net
ct06312

His Attorney

/s/

BY: ______________________________

Robert M. Berke
640 Clinton Avenue
Bridgeport, Connecticut 06606
Tel: (203) 332-6000
Fax: (203) 332-0661
robertberke@optonline.net
ct22117

His Attorney

**CERTIFICATION**

I hereby certify that on April 15, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Courts electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

/s/

________________________

Robert Berke